# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 3123 | **DATE** | 11/9/2000 |
| **CASE TITLE** | Myron Weiner, et al. vs. The Quaker Oats Co., et al. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 11/28/00 at 9:30 a.m.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's motion for summary judgment (Doc. No. 94-1) is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | | number of notices |
| ✓ | Notices mailed by judge's staff. | | NOV 1 3 2000 |
| | Notified counsel by telephone. | | date docketed |
| | Docketing to mail notices. | | |
| | Mail AO 450 form. | | docketing deputy initials |
| | Copy to judge/magistrate judge. | | |

ED-7
FILED FOR DOCKETING
00 NOV -9 PM 5:33

number of notices: 1

**Document Number** 113

11/9/2000 date mailed notice

ETV courtroom deputy's initials

ETV mailing deputy initials

Date/time received in central Clerk's Office

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**DOCKETED**

NOV 1 3 2000

| | |
|---|---|
| MYRON WEINER, NICHOLAS SITNYCKY, RONALD ANDERSON, and ROBERT FURMAN, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE QUAKER OATS COMPANY, and WILLIAM D. SMITHBURG,<br><br>Defendants. | No. 98 C 3123<br><br>Judge Rebecca R. Pallmeyer |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Nicholas Sitnycky and Robert Furman bring this action against Defendants The Quaker Oats Company ("Quaker") and William D. Smithburg ("Smithburg") on behalf of a class of persons who purchased Quaker common stock from August 4, 1994 through November 1, 1994. Plaintiffs contend that Defendants violated Section 10(b) of the Securities Exchange Act of 1934, and the Securities and Exchange Commission's ("SEC") Rule 10b-5, by announcing and/or failing to update a number of forward-looking statements concerning Quaker's debt-to-capitalization ratio. According to Plaintiffs, Defendants knew these statements were or had become inaccurate in light of Quaker's planned, highly-leveraged acquisition of Snapple Beverage Corp. ("Snapple"). This court has subject matter jurisdiction over this action pursuant to § 27 of the Securities and Exchange Act of 1934, 15 U.S.C. § 78aa and 28 U.S.C. § 1331.

Now before the court is Defendants' motion for summary judgment. For the reasons

113

stated below, Defendants' motion is denied.

## PROCEDURAL HISTORY

On November 10, 1994, just eight days after Quaker announced its acquisition of Snapple, purchasers of Quaker common stock filed two actions, later consolidated, in federal court in New Jersey. Plaintiff stock purchasers maintained that Defendants Quaker and Smithburg violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t, and Securities and Exchange Commission's Rule 10b-5, 17 C.F.R. § 240.10b-5. (Compl. at ¶ 40.) In their Complaint, Plaintiffs contended that when negotiations between Quaker and Snapple escalated in and around August 1994, Quaker and Smithburg must have known that its previously stated debt-to-capitalization ratio (also known as "leverage ratio") guideline, the upper-60 percent range, was no longer a realistic possibility. Plaintiffs also claimed that Defendants violated securities laws and implementing regulations by publicly overstating their expectations for earnings growth.

On May 23, 1996, Judge Lechner for the United States District Court for the District of New Jersey granted Defendants' 12(b)(6) motion, *see Weiner v. Quaker Oats Co.*, 928 F. Supp. 1372, 1388 (D.N.J. 1996) ("*Weiner I*"), concluding that (i) Quaker's stated leverage ratio guideline, as well as its earnings-growth projection, were not material misrepresentations, and (ii) because the Plaintiffs were unable to state a claim under § 10(b) and Rule 10b-5, the "controlling person" claim against Smithburg under § 20(a) must also be dismissed. *Id.* at

1385-87. Plaintiffs appealed the dismissal.[1] In an opinion issued on November 6, 1997, the Third Circuit affirmed the lower court's dismissal with respect to the earnings growth projection, but reversed the district court's finding with respect to the alleged leverage ratio omission. *See Weiner v. The Quaker Oats Co.*, 129 F.3d 310, 321 (3rd Cir. 1997) ("*Weiner II*"). The Third Circuit held:

> Defendants have failed to establish that plaintiffs can prove no set of facts in support of their claim which would entitle them to relief. The complaint alleges facts on the basis of which a reasonable factfinder could determine that Quaker's statements regarding its total debt-to-total capitalization ratio guideline would have been material to a reasonable investor, and hence that Quaker had a duty to update such statements when they became unreliable.

*Id.* at 318.

On remand, Judge Lechner signed a May 1, 1998 order granting the Defendants' motion to transfer to the Northern District of Illinois. In this court, Plaintiffs moved to certify a class consisting of all purchasers of Quaker common stock during the period of August 4, 1994 through and including November 1, 1994. This court granted that motion, certifying such a class to be represented by Plaintiffs Sitnycky and Furman. *See Weiner v. The Quaker Oats Co.*, No. 98 C 3123, 1999 WL 011381 at *10 (N.D. Ill. Sept. 30, 1999) ("*Weiner III*").

---

[1]     While Plaintiffs appealed the district court's finding that the forward-looking statements concerning Quaker's leverage ratio and earnings-growth projection were immaterial, "there is no indication [that Plaintiffs sought] to appeal from the district court's dismissal of the § 20(a) 'controlling person' claim against Smithburg." *Weiner v. The Quaker Oats Co.*, 129 F.3d 310, 315 n.6 (3rd Cir. 1997). Therefore, Plaintiffs' § 20(a) claim against Smithburg is considered dismissed. Nevertheless, Smithburg remains a Defendant in this case with respect to Plaintiff's § 10(b) and Rule 10b-5 claims.

# FACTUAL BACKGROUND[2]

Parties

Plaintiffs Sitnycky and Furman[3] both purchased Quaker common stock within what has been deemed the "class period" of August 4, 1994 to November 1, 1994. *See Weiner III*, 1999 WL 011381 at *10. Specifically, Plaintiff Sitnycky purchased 2,000 shares of Quaker common stock on September 14, 1994 and 500 shares of Quaker common stock on September 23, 1994. (Plaintiffs' Response to Defendants' Statement Pursuant to Local Rule 56.1, ¶ 1 (hereinafter Plaintiffs' 56.1 Response).) Plaintiff Furman purchased 1,000 shares of Quaker common stock on October 19, 1994. (Plaintiffs' 56.1 Response, ¶ 2.)

Defendant Quaker, founded in 1901, is a New Jersey corporation with its principal place of business in Illinois. (Defendants' Statement Pursuant to Local Rule 56.1, ¶ 3 (hereinafter Defendants' 56.1 Statement).) Quaker is a worldwide producer of brand name packaged goods. (*Id.*) Its primary products include cereals, breakfast cereals, breakfast syrups, pancake mixes, snack foods, frozen pizzas, cat foods, and dog foods. (*Id.*) Gatorade Thirst

---

[2]     The facts that follow are taken from the parties' Local Rule 56.1 statements, supplemented where necessary with the underlying depositions, affidavits, and documents attached thereto. The court notes that Plaintiffs filed a motion to strike all, or in the alternative certain, of the documents included in Defendants' 56.1 submission. Upon conditional review of Defendants' 56.1 materials, and given their failure to impact the court's decision to deny Defendants' motion for summary judgment, the court denies Plaintiffs' motion to strike as moot by separate order.

[3]     The Second Amended Class Action Complaint also names as plaintiffs Myron Weiner and Ronald Anderson. Plaintiff Weiner, however, did not seek class representative status, *see Weiner III*, 1999 WL 011381 at *2, and this court declined to certify Anderson as a class representative, *see id.* at *10.

Quencher is Quaker's largest single product. (*Id.*) Gatorade holds approximately 80 percent of the sports drink market with annual sales of about $1.2 billion. (*Id.*) Quaker's stock is publicly traded under the symbol "OAT" on the New York Stock Exchange ("NYSE"). (Seconded Amended Class Action Complaint at ¶ 18 (hereinafter Compl.).) Defendant Smithburg was the Chairman of the Board of Directors of Quaker from 1983 through 1997 and Chief Executive Officer of Quaker from 1981 through 1997. (Defendants' 56.1 Statement, ¶ 4.)

## The Allegedly False and Misleading Statements

Plaintiffs assert that Defendants misled the investing public by making a series of statements concerning Quaker's leverage ratio that were either false when made or later became misleading in light of a significant shift in corporate strategy. (Compl. at ¶ 6.) A corporation's leverage ratio is a calculation equal to the amount of a corporation's total debt (short-term and long-term) as a percentage of its total debt plus preferred and common shareholders' equity. (Defendants' 56.1 Statement, ¶ 35.)

The primary documents containing these allegedly false and/or misleading statements are (1) Quaker's October 4, 1993 Annual Report for the fiscal year ending June 30, 1993 (Exhibit 26 to Plaintiffs' 56.1 Response (hereinafter PX)); (2) Quaker's November 1993 Form 10-Q filed with the SEC (PX 37); and (3) Quaker's September 23, 1994 Annual Report for the fiscal year ending June 30, 1994 (PX 38).

The relevant language from these three documents follows:

1.    The 1993 Annual Report:

(a)     Our debt-to-capitalization ratio at June 30, 1993 was 59 percent, up
        from 49 percent in fiscal 1992. Quaker's total debt remained essentially
        even. . . . *For the future, our guideline will be in the upper-60 percent
        range.* (Defendants' Reply to Plaintiffs' Response to Defendants'
        Statement Pursuant to Local Rule 56.1, ¶ 38 (hereinafter Defendants'
        56.1 Reply); PX 26 at 32) (emphasis added.)

(b)     We believe that the prudent use of leverage can enhance shareholder
        value. Maintaining a strong financial position while increasing the level
        of debt reduces our overall cost of capital. That gives us the
        opportunity to undertake even more value-creating projects that drive
        future profitable growth and enhance operating efficiency. . . .
        Consistent with this philosophy, we announced in August 1993 that
        our Board of Directors authorized an increase in our leverage guideline,
        along with a share repurchase program of up to 5 million shares. *Our
        guideline for leverage in the future will be to maintain a total debt-to-total
        capitalization ratio in the upper-60 percent range.*

        Standard & Poor's and Moody's have recently reviewed our bond and
        commercial paper ratings and they remain unchanged. Moody's long
        and short-term ratings are A2 and P1, respectively. Standard & Poor's
        are A+ and A1. (Defendants' 56.1 Reply, ¶ 37; PX 26 at 34-35)
        (emphasis added.)

2.      The November 1993 Form 10-Q for the quarter ended September 30:

        Short-term and long-term debt (total debt) as of September 30, 1993,
        increased $98.6 million from June 30, 1993. The total-debt-to-total
        capitalization (total debt divided by total debt plus shareholders' equity
        including preferred stock, net of related deferred compensation) was
        63.5 percent and 59.0 percent as of September 30, 1993 and June 30,
        1993, respectively . . . . One of the Company's financial objectives is to
        generate economic value through the use of leverage, while maintaining
        a solid financial position through strong operating cash flows. *The
        Company has decided to increase its guideline for leverage in the future to
        the upper-60 percent range.* (PX 37 at 9) (emphasis added.)

3.      The 1994 Annual Report:

At the end of fiscal 1994, our total-debt-to-capitalization ratio was 68.8 percent
on a book-value basis, *in line with our guideline in the upper-60 percent range.*

(Plaintiffs' 56.1 Response, ¶ 62; PX 38 at 34) (emphasis added.)

In these same documents, Quaker also explained its desire to expand and its strategy for expansion. In the 1993 Annual Report, for example, Quaker stated:

> We continually seek opportunities to acquire businesses that offer profitable future growth. In potential acquisitions, we seek strong brand franchises positioned in growing, 'on-trend' categories. Our commitment to shareholder values guides us to acquire businesses whose future stream of discounted cash flows exceeds the acquisition price in today's dollars.

(Defendants' 56.1 Statement, ¶ 27.) Then, in the 1994 Annual Report, Quaker stated: "We also seek to acquire strong brand franchises to fortify our existing portfolio of leading brands." (Defendants' 56.1 Statement, ¶ 27.)

Two examples of such "opportunities" for expansion involved the Gerber Products Company and the Snapple Beverage Corp.

**The Gerber Bid**

In or around May 1994, approximately 6 months after issuing its 1993 Annual Report and 10-Q Form for the third quarter of 1993, Quaker was approached by Goldman Sachs ("Goldman"), financial advisor to the Gerber Products Company ("Gerber"), and asked about its interest in purchasing Gerber. (Defendants' 56.1 Reply, ¶ 7; DX 113 (Jartz Dep.) at 71.) The record does not indicate the individuals involved in this initial contact between Goldman and Quaker. In response to Goldman's inquiry, Quaker conducted an analysis of a Gerber acquisition with the help of Ira Harris, its financial advisor from the investment bank of Lazard Frères & Co. ("Lazard"). (*Id.*) According to John Jartz, the Vice President of Quaker's Business Development Group at the time, Quaker then submitted a bid letter to

Gerber, which was at that time the largest producer of baby food products. (PX 7 (Jartz

Dep.) at 72; PX 12 (Westbrook Dep.) at 87.) Jartz does not remember if he personally signed

the bid letter, but admits that he often does sign such correspondence. (Jartz Dep. at 72.)

While Defendants assert that they do not possess a copy of the bid letter, and thus have not

produced it (PX 42 (September 21, 1999 letter from attorneys for Defendants to attorneys for

Plaintiffs)), Jartz testified that the bid for Gerber was "around two billion dollars." (PX 7

(Jartz Dep.) at 73.) The potential acquisition of Gerber became known at Quaker as "Project

Maroon."[4] (*Id.* at 70).

The evidence demonstrates that Smithburg was aware of the potential Gerber

transaction. In fact, in a May 2, 1994 memorandum to Quaker's Board of Directors,

Smithburg predicted that "the likely transaction structure [was] a purchase of Maroon shares

for cash." (PX 17 (cover letter to a packet of materials addressed to the Quaker Board of

Directors providing an overview of Project Maroon) at 022870.) The memorandum referred

to the "potential acquisition candidate we will discuss at the Board meeting." (*Id.*) Because

Quaker "didn't have $2 billion of cash in the bank," (PX 9 (Lorenz Dep.) at 22:10-11) a cash

---

[4]     Defendants argue that the Gerber bid is entirely irrelevant to this case and
should therefore not be considered upon evaluation of its motion for summary judgment.
(Defendants' 56.1 Reply, ¶ 7.) Upon a motion for summary judgment, however, "a court
must construe all facts in the light most favorable to the non-moving party and draw all
reasonable and justifiable inferences in favor of that party." *See Myers v. Hasara*, 226 F.3d 821,
825 (7th Cir. 2000) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505,
91 L.Ed.2d 202 (1986)). A jury may consider Quaker's proposal to acquire Gerber, financed
by debt, as evidence that Defendants intended to stray from Quaker's stated leverage ratio
during the period prior to the Snapple acquisition. *See* FED. R. EVID. 401.

purchase of Gerber would have been, at least partially, financed by debt. (PX 11 (Smithburg Dep.) at 65; PX 19 (documents describing Project Maroon) at 081804 (characterizing the "OAT/MAROON" acquisition as a "DEBT PURCHASE").) In order to prepare for this eventuality, Janet Cooper, Treasurer of Quaker, contacted Brad Bernstein of NationsBank. (PX 2 (Bernstein Dep.) at 43.) Pursuant to this contact, NationsBank agreed to underwrite up to $3 billion if Quaker's acquisition of Gerber went forward. (*Id.* at 42-43.)

Had Quaker's bid for Gerber been accepted (and fully financed with debt), Quaker's leverage ratio would have increased from the "upper-60 percent" range to approximately 81-83%. (Plaintiffs' 56.1 Response, ¶ 51.) Quaker's bid, however, was rejected. (PX 7 (Jartz Dep.) at 74.) Instead, Gerber accepted what it deemed to be a more attractive bid from Sandoz Ltd., a large pharmaceutical manufacturer. (*Id.*)

**Quaker's Acquisition of Snapple Beverage Corp.**

In March or April of 1994, just a month or two before Quaker was approached by Gerber, Ira Harris of Lazard spoke on Quaker's behalf with Thomas Lee (of Thomas H. Lee Co. ("THL"), controlling shareholder of Snapple) about a possible transaction or, alternatively, the development of a "strategic relationship." The code-name at Quaker for the negotiations with Snapple was "Project August." (PX 14 (11/3/94 Lazard Frères memorandum outlining the chronology of the Snapple acquisition); PX 39 (selected pages from Quaker's 11/1/94 Schedule 14D-1).)

For the next few months, Quaker studied public information (e.g., market studies, share data, product quality, consumer awareness) and performed independent research on

Snapple in order to determine whether any such relationship would serve Quaker's corporate interests. (Plaintiffs' 56.1 Response, ¶ 9.) For example, Quaker hired The Cambridge Group, an outside consulting firm, to analyze the value of the Snapple trademark. (DX 4 (Marineau Dep.) at 70.) Quaker soon determined that Snapple was the type of "high-growth, high-profit margin product that could yield certain synergies with Quaker's Gatorade product." (Defendants' 56.1 Statement, ¶ 8.) Consequently, in early August 1994, Quaker management, including Smithburg, met with Lee and John Childs, also of THL, to formally express Quaker's desire to pursue an acquisition of Snapple. (PX 39 (selected pages from Quaker's November 1, 1994 Schedule 14D-1).) On August 4, 1994, at or around the same time as this meeting, Quaker issued a company statement in a published report for securities analysts and financial reporters, including Moody's Investor Service (a debt-rating agency). (Plaintiffs' 56.1 Response, at ¶ 54; PX 30.) In this report, Quaker did not revise or alter its previously announced leverage ratio guideline. (*Id.*)

Concurrent with its continued analysis of a Snapple acquisition, Quaker began to explore the possible sale of certain of its low return businesses, including United States and European pet foods, Mexican chocolates, and Italian oils. (Defendants' 56.1 Statement, ¶ 29.) In fact, numerous Quaker analyses outlining the impact of a Snapple acquisition assumed such a divestiture. (Defendants' 56.1 Reply, ¶ 31.) According to these same analyses, Quaker planned to use the proceeds from these proposed sales in order to reduce the debt (if any) that it would incur from a leveraged acquisition of Snapple. (Defendants' 56.1 Statement, ¶ 32.)

After the early August meeting, Quaker embarked upon a more extensive due

diligence process during which it received and reviewed non-public information. (Defendants' 56.1 Reply, ¶ 9.) On September 8, Joseph Lorenz, a member of Quaker's Business Development team, submitted a packet of "Project August" materials to Smithburg for use at a Quaker Board of Directors meeting the following week. (PX 9 (Lorenz Dep.) at 26.) Among these materials was a document with two short lines referencing the parties' preference with respect to the structure of a potential acquisition: "OAT PREFERS DEBT" and "SELLER PROBABLY PREFERS STOCK." (PX 22 (9/8/94 memorandum on Project August from Lorenz to Smithburg in preparation for a presentation to the Quaker Board of Directors) at 1279.) "OAT" obviously referred to Quaker, and "SELLER" to Snapple.

With respect to structure, Smithburg testified in his deposition that by early September, Quaker began to consider three options: (1) an all-cash, debt-financed purchase, (2) a 100% stock purchase, and (3) a part-cash/part-stock (or "pooling") arrangement. (PX 11 (Smithburg Dep.) at 134.) The structure of the transaction would have a significant bearing on Quaker's leverage ratio at closing. For example, according to a Quaker document included in the materials that Lorenz submitted to Smithburg on September 8, 1994, assuming a purchase of Snapple at $15/share and no concurrent divestitures, the leverage ratio at closing would be (1) 81% as a result of an all-cash purchase, (2) 32% as result of an all-stock purchase, and (3) 45% as a result of a pooling arrangement. (PX 22 at 1262.)

Quaker continued to evaluate Snapple as a potential acquisition candidate, and meet extensively with Snapple representatives, through October 27, 1994. (Defendants' 56.1 Statement, ¶ 12-13.) On October 27, Philip Marineau, President of Quaker, sent Quaker

management (including Smithburg) a memorandum stating: "I support the notion to use as much cash as possible to purchase August." (PX 21.) In his deposition, Marineau testified that "[his] business philosophy is that you are better off buying with cash when you can." (PX 10 (Marineau Dep.) at 83.) That next day, Quaker first approached NationsBank (the same bank with which it dealt in the failed Gerber bid) to obtain financing for the Snapple acquisition.

On October 30, the parties engaged in what became an all-night negotiating session at the Regency Hotel in New York (the "Regency Meeting"). Quaker was represented at this meeting by Jartz, Harris, and James Doyle (head of Quaker's Gatorade business). (DX 5 (Doyle Dep.) at 91.) For purposes of this meeting, the Quaker representatives were instructed to negotiate only an all-cash purchase. (Plaintiffs' 56.1 Response, ¶ 59.) Notwithstanding this fact, Harris testified that the parties discussed and considered all three of the transactional structures that had been under consideration at Quaker since early September. (DX 6 (Harris Dep.) at 51.)

On October 31, 1994, Quaker and Snapple representatives agreed in principle that Quaker would acquire Snapple in an all-cash transaction at $14/share, a total of $1.7 billion. (Defendants' 56.1 Statement, ¶ 21.) In order to effectuate this acquisition, Quaker borrowed approximately $1.5 billion from a NationsBank-led syndicate. (Plaintiffs' 56.1 Response, ¶ 65.) Quaker's Board of Directors approved Quaker's acquisition of Snapple, and Quaker and Snapple entered into a merger agreement on November 1, 1994. (Defendants' 56.1 Statement, ¶ 22.)

The Snapple acquisition was publicly announced on November 2, 1994. (Defendants' 56.1 Statement, ¶ 23.) In a statement to Bloomburg Business News made that day, Defendant Smithburg stated that: "[R]ight after some discussions started, it was so obvious that they [Snapple] had an interest and we had an interest and these two great brands, Gatorade and Snapple, will benefit from a put together, and it just snowballed from then . . . ." (PX 44.) Plaintiffs believe that Smithburg's statement referred back to the March or April discussion between Ira Harris and Snapple representatives, while Defendants obviously assume Smithburg's statement referred to the discussions between Quaker management and Snapple that took place in August. (Defendants' 56.1 Statement, ¶ 6; Plaintiffs' 56.1 Response, ¶ 6; Defendants' 56.1 Reply, ¶ 6.)

Regardless, the financing of the Snapple acquisition had caused Quaker's leverage ratio, which had been 68.8% on June 30, 1994 (*Id.* at ¶ 59) to rise to 86%. (*Id.* at ¶ 66.) On the day the acquisition was announced, the price of Quaker stock fell by more than $7 per share. (Plaintiffs' 56.1 Response, ¶ 64.) Plaintiffs attribute this drop in stock price to the sharp increase in Quaker's leverage ratio. (Plaintiffs' Memorandum in Support of Their Motion to Strike Defendants' Summary Judgment Submissions and in Opposition to Defendants' Motion for Summary Judgment at 33.) In March and April 1995, respectively, Quaker sold its United States and European pet foods businesses and realized proceeds of $1.425 billion in connection with those divestitures. (Defendants' 56.1 Statement, ¶ 33.) The record does not indicate the effect, if any, that these divestitures had on the value of Quaker stock. It is clear, however, that as a result of these proceeds, Quaker's leverage ratio returned to the

"upper-60 percent range." (*Id.* at ¶ 34.)

Two years after the acquisition, Quaker undertook to sell Snapple for $1.4 billion less than the acquisition price. *See* Barnaby J. Feder, *Quaker to Sell Snapple for $300 Million*, N.Y. TIMES, Mar. 28, 1997, at D1, D16, *cited in Weiner II*, 129 F.3d at 312 n.2. Quaker's purchase of Snapple has been labeled by some analysts "the worst acquisition in recent memory." (*Id.*)

Defendants now move for summary judgment on Plaintiff's securities fraud claim. Defendants' motion has four bases. First, Defendants argue that the statements in Quaker's 1993 Annual Report and September 1993 10-Q are not actionable because there is no "duty to update" forward-looking statements that were correct when made. Second, Defendants contend that the statement in Quaker's 1994 Annual Report is not actionable because, at the time Defendants made the statement, they had a reasonable basis for believing it to be true. The Defendants point to evidence demonstrating that the price and structure of the Snapple purchase was not decided upon until late October 1994, just days before the purchase was publicly announced. Third, Defendants believe the omitted information–Quaker's intention to exceed the stated leverage ratio guideline–was immaterial as a matter of law because no "reasonable investor" could have assumed the guideline to be a ceiling that Quaker could never, even temporarily, exceed. Fourth, Defendants insist that Plaintiffs have not demonstrated that Defendants have acted with the level of intent required to prevail on their claims.

Plaintiffs have responded to each of Defendants' arguments. First, with respect to the disputed statements in all three Quaker documents (the 1993 Annual Report, the September

14

1993 10-Q and the 1994 Annual Report), Plaintiffs note that the Third Circuit has already recognized the existence of a "duty to update" in this very case. Second, even if such a duty were not recognized, Plaintiffs urge that Defendants' statement in Quaker's 1994 Annual Report would still be actionable because it was false when made and/or made without a reasonable basis. According to Plaintiffs, Defendants had decided to abandon the "upper-60%" guideline as early as the Spring of 1994, when Quaker bid for Gerber. Third, Plaintiffs believe the evidence is sufficient for a jury to find that Defendants' alleged misrepresentations and omissions were material because of the importance of the leverage ratio to a reasonable investor as an indicator of corporate stability. Fourth, Plaintiffs contend that Defendants acted with scienter because (a) their intent was to artificially inflate the price of Quaker stock, thereby making Quaker less susceptible to a hostile acquisition, or, in the alternative, (b) their failure to disclose plans to exceed the stated leverage ratio guideline represented an extreme departure from the standard of care owed to Quaker shareholders.

The court recognizes that the Snapple acquisition may have disappointed Quaker shareholders for reasons unrelated to the company's debt-to-capitalization ratio, and that a federal securities action may not be an appropriate avenue for challenging Defendants' business judgment. Nevertheless, the court concludes that disputed issues require that Defendants' motion for summary judgment be denied.

## DISCUSSION

I.    Summary Judgment Standard

Summary judgment is appropriate only when "the pleadings, depositions, answers to

interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). *See also Flores v. Preferred Tech. Group*, 182 F.3d 512, 514 (7th Cir.1999). It is the movant's burden to establish the lack of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Because the burden of establishing intent or knowledge is difficult, summary judgment should be approached carefully in cases involving these issues. *See Scheib v. Grant*, 22 F.3d 149, 155 (7th Cir. 1994) (citations omitted).

## II.    Section 10(b) and Rule 10b-5 Liability

Plaintiffs assert claims under Sections 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b),[5] and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.[6] Rule 10b-5 provides the framework for a private cause of action for violations

---

[5]    Section 10(b) provides:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange (b) to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

[6]    Rule 10b-5 provides:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(continued...)

involving false statements or omissions of material fact. *See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 171 (1994). In order to establish a valid claim of securities fraud under Rule 10b-5, Plaintiffs must prove that Defendants (1) made misstatements or omissions; (2) of material fact; (3) with scienter; (4) in connection with the purchase or sale of securities; (5) upon which Plaintiffs relied; and (6) that Plaintiffs' reliance was the proximate cause of their injury.[7] *See In re Healthcare Compare Corp. Secs. Litig.*, 75 F.3d 276, 280 (7th Cir. 1996); *In re Phillips Petroleum Secs. Litig.*, 881 F.2d 1236, 1244 (3rd Cir. 1989) (hereinafter *Phillips*). To repeat, Plaintiffs' claim is one of nondisclosure: in their view, Defendants had a duty to disclose the fact that the leverage ratio Quaker had long articulated was no longer a possibility. Defendants, while disputing the existence of a "duty to update," the materiality of the alleged omission, and the presence of the requisite scienter, have not

---

[6](...continued)

    (a)      To employ any device, scheme, or artifice to defraud,

    (b)      To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

    (c)      To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

[7]      As already discussed, Smithburg remains an individual Defendant in this case with respect to Plaintiffs' § 10(b)/Rule 10b-5 claims. Plaintiffs have alleged that Smithburg controlled the content of press releases, SEC filings, and other disclosures to securities analysts and the investing public during the class period. (Compl. at ¶ 10.) With respect to individual defendants, the analysis of securities fraud liability is basically the same as it is for the corporate entity. *See Renovitch v. Kaufman*, 905 F.2d 1040, 1046 n.7 (7th Cir. 1990). For example, Plaintiffs must prove, most notably, that Smithburg acted with scienter.

challenged the sufficiency of Plaintiffs' evidence of reliance, causation, or damages.

## A. Choice of Law

Before turning to Plaintiffs' § 10(b) and Rule 10b-5 claims, the court notes that, in accordance *Eckstein v. Balcor Film Investors*, 8 F.3d 1121 (7th Cir. 1993), most of the issues addressed herein are controlled by Seventh Circuit case law. *See Eckstein*, 8 F.3d at 1126 (law of the transferee circuit should apply where a federal law is intended to be interpreted uniformly throughout the country).[8] Nevertheless, the "law of the case" doctrine directs this court to defer to Third Circuit case law on those issues already decided by the *Weiner II* court. *See Hayman Cash Register Co. v. Sarokin*, 669 F.2d 162, 169 (3rd Cir. 1982) ("Adherence to law of the case principles is even more important in th[e] context where the transferor judge and the transferee judge are not members of the same court."); *Chicago & North Western Trans. Co. v. United States*, 574 F.2d 926 (7th Cir. 1978) ("We affirm on the

---

[8]     Conversely, as the *Epstein* court noted, "when the law of the United States is geographically non-uniform, a transferee court should use the rule of the transferor forum in order to implement the central conclusion of *Van Dusen* and *Ferens*: that a transfer under § 1404(a) accomplishes 'but a change of courtrooms.'" *Epstein*, 8 F.3d at 1127. Based on this principle, the *Epstein* court held that § 27A, a 1991 amendment to the Securities Exchange Act of 1934 ("Exchange Act") "implies a non-uniform federal law." *Id.* Section 27A "recognize[d] that different circuits had taken different approaches to the appropriate statute of limitations in suits under § 10(b), and codifie[d] this fractured nature of federal law for cases filed before June 20, 1991." *Epstein*, 8 F.3d at 1126. Citing *Epstein*, Defendants have conceded that "the Seventh Circuit has found that where the law of the transferor forum (i.e., the Third Circuit) differs from the law of the Seventh Circuit, the transferor forum's law (in this case, Third Circuit law) controls." Memorandum of Law in Support of Defendants' Motion for Summary Judgment, at 10 n.3. Notwithstanding this admirable concession, the court finds no indication that the holding in *Epstein* was meant to extend beyond the scope of § 27A and cover the remainder of what should be considered a geographically uniform statute.

ground that the issues presented were decided by a federal court of coordinate status in an earlier appeal in this same case, and, therefore, the doctrine of the law of the case forecloses reconsideration of these issues by us.") (internal citation omitted).

### B.    Actionable Omissions–The Duty to Update

The threshold issue here is whether Defendants had a "duty to update" their statements in the 1993 Annual Report, September 1993 10-Q, and 1994 Annual Report, regarding Quaker's leverage ratio.[9] The *Weiner II* court, relying on Third Circuit case law, recognized a "duty to update" and implicitly concluded that the type of statements in question triggered such a duty as a matter of law. *See Weiner II*, 129 F.3d at 316. The court quoted from *Phillips*, where the Third Circuit had explained that "[t]here can be no doubt that a duty exists to correct prior statements, if the prior statements were true when made but misleading if left unrevised." *Phillips*, 881 F.2d at 1245. Citing to the doctrine of the "law of the case," Plaintiffs object to any further analysis of this issue. Defendants, on the other hand, note that the "law of the case" doctrine does not apply if the appellate court's decision is "clearly erroneous." *See Key v. Sullivan*, 925 F.2d 1056, 1060 (7th Cir. 1991) ("Previously decided determinations are not applied if there are reasons rendering the doctrine

---

[9]        It is important to recognize that Plaintiffs have not brought a "duty to correct" claim. A "duty to correct" applies "when a company makes a historical statement that, at the time made, the company believed to be true, but as revealed by subsequently discovered information actually was not." *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410 (3rd Cir. 1997) (citing *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1333 n.9 (7th Cir. 1995)). A "duty to update," on the other hand, "concerns statements that, although reasonable at the time made, become misleading when viewed in the context of subsequent events." *Id.* at 1431.

inapplicable. These would include (1) substantial new evidence introduced after the first review, (2) a decision of the Supreme Court after the first review, and (3) a conviction on the part of the second reviewing court that the decision of the first was clearly erroneous.' ") *citing Chicago & North Western*, 574 F.2d at 930. Defendants have urged this court to find the recognition of a "duty to update" in *Weiner II* "clearly erroneous" because it does not reflect, and is inconsistent with, Third Circuit precedent.

The court is puzzled by the notion that a district court in this circuit could conclude that the Third Circuit misinterpreted its own case law. Even if it were appropriate to reach the question, the court is not persuaded that *Weiner II* is inconsistent with Third Circuit precedent. As already noted, the Third Circuit recognizes a "duty to update" forward-looking statements that although reasonable at the time made, become misleading in the context of subsequent events.[10] It has drawn a distinction, however, between forward-looking

---

[10]    The Third Circuit is not alone in this regard. *See, e.g., In Re Time Warner Securities Litig.*, 9 F.3d 259, 267 (2d Cir. 1993) ("We agree that a duty to update opinions and projections may arise if the original opinions and projections have become misleading as a result of intervening events."); *Backman v. Polaroid Corp.*, 910 F.2d 10, 17-18 (1st Cir. 1990) (en banc) ("in special circumstances, a statement, correct at the time, may have a forward intent and connotation upon which parties may be expected to rely. If this is a clear meaning, and there is a change . . . further disclosure may be called for."). The Seventh Circuit, on the other hand, has yet to recognize a "duty to update." *See Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1333 n.9 (7th Cir. 1995). *See also Grassi v. Information Resources, Inc.*, 63 F.3d 596 (7th Cir. 1995) (refusing to recognize a "duty to update" an earnings growth projection). In *Stransky*, however, the allegedly misleading statement involved a "run of the mill" earnings projection, and the court was careful to note that its decision "expresses no opinion on whether the outcome would be the same if a plaintiff contested statements of intent to take a certain action." *See Stransky*, 51 F.3d at 1332 n.4. At least one commentator, addressing *Weiner II* and other cases, has opined that the "bewildering case law" involving the
(continued...)

statements that are "run of the mill" (for which there is no "duty to update") and those that "could fundamentally change the natures of the companies involved" (for which a "duty to update" does exist). *See In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410 (3rd Cir. 1997) (hereinafter *Burlington*). For instance, in *Burlington*, the plaintiff investors claimed, *inter alia*, that the defendant misrepresented its future prospects to the public by expressing "comfort" with analyst projections of $1.20 to $1.30 as a mid-range for earnings per share for fiscal year 1994. *See id.* at 1427. According to the plaintiffs, the defendants then received information which materially changed the company's earnings prospects, yet failed to update their original "expression of comfort." *See id.*

In assessing this earnings projection (or, more precisely, defendants' endorsement thereof), the *Burlington* court acknowledged Third Circuit case law which had recognized a duty to update forward-looking statements. *See Burlington*, 114 F.3d at 1410 (citing *Greenfield v. Heublein, Inc.*, 742 F.2d 751, 758 (3rd Cir. 1984) and *Phillips*, 881 F.2d at 1245). In both *Greenfield* and *Phillips*, the *Burlington* court noted, the original statements allegedly giving rise to a duty to update involved takeover attempts. Yet, in declining to find a "duty to update" on the facts before it, the *Burlington* court distinguished *Greenfield* and *Phillips*. Those cases, the court said, involved "a fundamental change in the course the company is likely to take." *Burlington*, 114 F.3d at 1434. "Finding a duty to update a disclosure of a

---

[10](...continued)
"duty to update" "is in dire need of clarification and consistency, which will come only from further legislative action or a Supreme Court decision . . . ." Jeffrey A. Brill, *The Status of the Duty to Update*, 7 CORNELL J.L. & PUB. POL'Y 605, 677 (Winter 1998).

takeover threat," the court continued, "is a far cry from finding a duty to update a simple earnings forecast which, if anything, contains a clear implication that circumstances underlying it are likely to change." *Id. See also In re Advanta Corp. Secs. Litig.*, 180 F.3d 525, 539 (3rd Cir. 1999) (finding that accurate reports of past earnings and general expressions of optimism for the future are neither material nor actionable).

This court must determine whether the *Weiner II* court's implicit classification of Defendants' statements/omissions as involving a "fundamental change" (as opposed to something "run of the mill") was "clearly erroneous." By establishing a guideline for its leverage ratio, a company informs the public, including present and future shareholders, as to how leveraged it is now and how leveraged it intends to be in the future. This is an important financial figure which investors consider when appraising a company. In fact, Philip Marineau, Quaker's President and Chief Operating Officer from 1993 until October 1995, testified that Quaker disclosed its leverage ratio in its 1993 Annual Report because:

> for investors, it's important for them to understand what your management philosophy is for managing your balance sheet and striking the right balance between cash flow and cost of capital. . . . This is an important understanding that investors should have, and it was a change from where we had previously been and, therefore, it should be communicated to investors.

PX 10 (Marineau Dep.) at 45. Smithburg also acknowledged the importance of the leverage ratio guideline, noting that it is "a meaningful piece of information and a meaningful piece of the financial strength and creditworthiness of the company." PX 11 (Smithburg Dep.) at 42-43.

This is not a mere "soft" projection as to the firms earnings or a general expression of

optimism. Instead, it is a figure over which the company and its executives, in this case Quaker and Smithburg, have far greater control. Deciding to assume a significant amount of debt over and above the percentage set forth in its public documents can surely be viewed by investors as an extreme change in corporate strategy. Because this court does not consider the Third Circuit's interpretation of precedent and its application to the facts of this case to be "clearly erroneous," it finds that Defendants' omissions do give rise to a "duty to update." *See* Jeffrey A. Brill, *The Status of the Duty to Update*, 7 CORNELL J.L. & PUB. POL'Y 605, 672 (Winter 1998) ("In *Weiner [II]*, Quaker's material omission was in the context of a merger, that is, like the circumstances surrounding the statements in *Greenfield* and *Phillips* []. . . . The Third Circuit presumably viewed the types of statements in *Greenfield*, *Phillips* [] and *Weiner [II]*, in contrast to those in *Burlington* [], as material statements on which a reasonable investor might rely."). Plaintiffs' claims will therefore survive Defendants' motion for summary judgment if disputed issues of fact exist with respect to materiality and scienter.

Even if the court were to conclude that there is no "duty to update" forward-looking statements, Plaintiffs urge that Defendants' statement in Quaker's 1994 annual report is nevertheless actionable because it was false when made, or at least made without a reasonable basis. Both the Third and Seventh Circuits have recognized that a forward-looking statement can give rise to §10(b) and Rule 10b-5 liability if so made. *See Burlington*, 114 F.3d at 1427; *Stransky v. Cummins Engine Co.*, 51 F.3d 1329 (7th Cir. 1995). The court concludes it is bound by the Third Circuit's determination on the "duty to update" and that the relevant statements in all three Quaker documents are actionable. As discussed more fully below, *see*

*infra* Section III (Scienter), the court concludes there are disputed issues of material fact which warrant that Plaintiffs' claim also go forward on the grounds that the statement in the Quaker 1994 Annual Report is independently actionable because it was either false when made or made without a reasonable basis.

## II.   Materiality

The court must next decide whether a reasonable juror could consider Defendants' repetition of and failure to update Quaker's "upper 60-percent" range leverage ratio was a material factor in Plaintiffs' evaluation of and actions with respect to Quaker common stock. In *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988), the Supreme Court declared that "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [proceed]." *Id.* at 231. In other words, in order to be material, "the disclosure of the omitted fact would have [had to have] been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Id.* This determination is a "highly fact-dependent analysis," *see Searls v. Glasser*, 64 F.3d 1061 (7th Cir. 1995), upon which summary judgment is "rarely appropriate," *see McCoy v. WGN Broadcasting Co.*, 957 F.2d 368, 371 (7th Cir. 1992), *cited in Snap-On Inc. v. Ortiz*, No. 96 C 2138, 1999 WL 592194, at *8 (N.D. Ill. Aug. 3, 1999).

Defendants argue that the statements and alleged omissions fail to satisfy these materiality requirements because no "reasonable investor" could have construed them to impose a permanent and/or absolute ceiling on Quaker's leverage ratio. Thus, disclosure of any intention to deviate, even temporarily, from the guideline would not have affected a

"reasonable investor's" expectations or decision to purchase Quaker common stock. In support of their position, Defendants cite to Webster's Third New International Dictionary wherein the word "guideline" is defined as merely "an indication or outline of future policy or conduct." Defendants contend that Plaintiffs' interpretation of Defendants' statements is made even more unreasonable when one considers surrounding language in the relevant Quaker documents. For example, while the Form 10-Q for the quarter ended September 30, 1993 included the "upper-60 percent" language, it also stated that "one of the Company's financial objectives is to generate economic value through the use of leverage." Likewise, in addition to its mention of the "upper-60 percent" language, Quaker's 1994 Annual Report also stated: "We [Quaker] believe that *prudently* using leverage can enhance shareholder value. Maintaining a strong financial position while increasing our total debt reduces our overall cost of capital." (emphasis added).

This court finds Defendants' arguments unconvincing. The notion that Quaker's assurances concerning the leverage ratio were important to investors cannot be considered so unreasonable as to preclude the issue from reaching a jury. As already discussed, Defendant announced this guideline on more than one occasion, and, by repeating it, may well have led its present or future shareholders to expect that such a leverage ratio would be maintained. Moreover, statements elsewhere in Quaker's public documents concerning "prudent" use of leverage do not necessarily evidence a willingness to incur debt over and above the "upper-60 percent" range. On the contrary, as Plaintiffs note, combined with the guideline language, these statements actually make it more likely that a "reasonable investor"

would believe that it was the "upper-60 percent" figure which represented a "prudent" use of leverage.

Finally, the leverage ratio, as discussed above, is an important financial figure. As such, it is distinguishable from purely promotional comments which have been held immaterial by Seventh Circuit courts. *Cf. Glasser*, 64 F.3d at 1066 ("Just as indefinite predictions of 'growth' are better described as puffery rather than as material statements of fact, describing a company as 'recession-resistant' lacks the requisite specificity to be considered anything but optimistic rhetoric."). To be sure, Plaintiffs' only support for the importance, and consequent materiality, of the leverage ratio is deposition testimony from Quaker management. No Plaintiff attested to the role that Quaker's leverage ratio played in his own decision to purchase Quaker stock. And, more notably, neither party offered the opinion of a securities analyst, mutual fund manager, or other expert on the importance of the leverage ratio figure to a reasonable investor's assessment of corporate health.[11] It is this court's expectation that such evidence will be presented to a jury at trial.

Notwithstanding this evidentiary gap, the court concludes that there is sufficient

---

[11]    Defendants did offer evidence of circumstances they believe demonstrates the purported immateriality of the omission concerning Quaker's leverage ratio guideline. Specifically, Defendants point to an August 5, 1993 announcement wherein Quaker increased its leverage ratio from the upper-50% range to the upper-60% range. When the news was announced, the price of Quaker common stock actually increased from $63.25 per share to $64 per share. This fact could have been caused by myriad factors not mentioned by Defendants and is therefore not nearly enough to convince this court that "reasonable investors" could not have considered the allegedly omitted fact in this case to "significantly alter[] the total mix of information made available."

evidence that a reasonable investor could have considered the leverage ratio statements important enough to be material to their overall perception of Quaker. *See Craftmatic Secs. Litig. v. Kraftsow*, 890 F.2d 628, 641 (3rd Cir. 1989) ("Only when the disclosures or omissions are so clearly unimportant that reasonable minds could not differ should the ultimate issue of materiality be decided as a matter of law.").

III.  **Scienter**

Lastly, the court turns to the element of scienter. In order to satisfy the scienter requirement of § 10(b) and Rule 10b-5, a plaintiff must demonstrate either that a defendant had "the intent to deceive, manipulate or defraud," *see Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976), or a "reckless disregard for the truth of the material asserted whether by commission or omission," *Danis v. USN Communications, Inc.*, 73 F. Supp. 2d 923 (N.D. Ill. 1999) (quoting *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1044 (7th Cir. 1977)). Reckless conduct is defined by courts as "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rehm v. Eagle Finance Corp.*, 954 F. Supp. 1246, 1255 (N.D. Ill. 1997). Yet, while the standard for proving reckless disregard, and scienter in general, is quite high, a grant of summary judgment on a question of intent is "notoriously inappropriate." *McCoy*, 957 F.2d at 371, *cited in Snap-On Inc. v. Ortiz*, No. 96 C 2138, 1999 WL 592194, at *8 (N.D. Ill. Aug. 3, 1999).

Plaintiffs' scienter argument consists of two prongs: motive and reckless disregard.

With respect to motive, Plaintiffs contend, Defendants selectively and strategically used communication channels with the public in order to inflate the price of Quaker's common stock, fend off a rumored takeover, and preserve management jobs. As for reckless disregard, Plaintiffs claim that Defendants were actively taking steps to radically depart from the repeated leverage ratio guideline since the Spring of 1994, but recklessly failed to update the public as to these intentions. As discussed below, the court is unmoved by the motive argument, but concludes that Plaintiffs' showing on reckless disregard is sufficient to survive summary judgment.

### 1. Motive

Plaintiffs assert that, by publicly representing that Quaker would limit its leverage ratio to the upper-60 percent range and thereby not become over-leveraged, Defendants sought to insure that Quaker would trade at a high enough price to deter unwanted suitors. Plaintiffs offered little evidence in support of this bold theory. To be sure, Defendants do not dispute that certain Quaker employees, including Smithburg, were aware of takeover rumors. Smithburg acknowledged that in 1994 he read newspaper articles which discussed the possibility of a hostile takeover. PX 11 (Smithburg Dep.) at 117. As Defendants note, however, such rumors had been swirling around Quaker for approximately twenty years. PX 3 (Doyle Dep.) at 39. Moreover, the only evidence that such rumors were actually discussed at Quaker in 1994 is an October 27, 1994 memorandum *from Quaker's investment bankers* indicating that Quaker's stock had increased 15-20% during 1994 as a result of takeover speculation. Plaintiffs' 56.1 Response, ¶ 24. Then, in their only real attempt to

jump from Defendants' knowledge of a takeover threat to a scheme to eliminate it, Plaintiffs'

quote *Snapple's* investment advisor who noted that the acquisition of Snapple "*could be*

*perceived by some* as a built-in poison pill." PX 25 (10/28/94 "Preliminary Fairness Opinion

Review" memorandum) at 0104. Without more evidence, a reasonable juror cannot conclude

that Defendants failed to update their leverage ratio figure in order to maintain an elevated

stock price and thus thwart a hostile takeover of Quaker. *See, e.g., In re Goodyear Tire &*

*Rubber Co. Secs. Litig.*, Civ. A. No. 88-8633, 1993 WL 130381 (E.D. Pa. Apr. 22, 1993)

("[P]laintiff's contention that Goodyear wanted to increase the market value of its stock, in

part, to avoid a hostile takeover, falls woefully short of demonstrating scienter under federal

securities law.").

    2.    **Recklessness**

In addition to its scant evidence of motive, though, Plaintiffs have offered significant

evidence that Defendants behaved in a highly unreasonable and otherwise reckless fashion

by not disclosing intentions to depart from Quaker's stated and repeated "upper-60 percent"

leverage ratio figure. In response to Plaintiffs' assertion of reckless behavior, Defendants

argue that, up until late October 1994, they reasonably believed that Quaker would maintain

a leverage ratio in the "upper-60 percent" range.[12] In fact, Defendants contend, Quaker did

---

[12]    Alternatively, Defendants argue that even if they knew of an intended increase in leverage ratio at an earlier point in time, their nondisclosure was not reckless because they knew that any rise would be temporary. Once they completed the planned divestitures of certain Quaker businesses, which was expected to occur rather quickly, the leverage ratio would return to pre-acquisition levels. This argument may well persuade a jury that
(continued...)

not even decide that Snapple was a viable acquisition candidate until this time. In support, Defendants extensively cite deposition excerpts from Quaker representatives which state, *inter alia*, that: (1) as of mid-August, Quaker was still at the "very early stages of consideration of [a] Snapple merger." DX 3 (Smithburg Dep.) at 59; (2) as of mid-October "there were a huge number of issues that still needed to be resolved," DX 18 (Jartz Dep.) at 177; (3) on October 18, Quaker representatives met Snapple representatives and at the time of this meeting "there was certainly no determination that [Quaker] was going to buy the business," *Id.* at 174-75; and (4) as of October 27, Quaker was "still considering whether [it] even wanted to purchase the [Snapple] business . . . ." *Id.* at 145.

Moreover, Defendants argue, while they may have formally decided to acquire Snapple in late October, it was not until the very last day of October that they decided to pursue an all-cash, debt-financed transaction. Again, Quaker supports its assertion with deposition excerpts: (1) as of September, "no decision on structure had been made," DX 3 (Smithburg Dep.) at 133-35; (2) as of October 27, "there was still a debate raging . . . within [Quaker] as to whether the deal should be done cash or the deal should be done cash/stock," DX 5 (Doyle Dep.) at 130-131; and (3) Quaker's first contact with NationsBank regarding financing for the Snapple acquisition occurred over the weekend of October 28, DX 87 (Bernstein Dep.) at 37-38, 41.

---

[12](...continued)
Defendants lacked scienter; they do not require such a determination as a matter of law, however, and Plaintiffs are entitled to present evidence in support of their position on the issue.

While Defendants' proffered evidence surely raises some doubt as to the existence of scienter, Plaintiffs have offered sufficient evidence to raise a genuine issue of fact on this element. Plaintiffs' evidence indicates that Defendants may very well have known of Quaker's intention to deviate from the "upper-60 percent" guideline far earlier than Defendants admit. For example, Plaintiffs note that in May 1994 Quaker submitted a bid to acquire Gerber for over $2 billion using "as much cash as possible." Defendant Smithburg was fully aware of this bid. At around the same time that its bid was rejected by Gerber, Quaker's financial advisor, Lazard, initiated discussions with Snapple about a potential "strategic relationship." Then, in August, Quaker management met with Snapple representatives to formally express their interest in pursuing an acquisition. Finally, as early as September 8, 1994, a packet of materials was submitted to Smithburg which included a document stating "OAT [Quaker] PREFERS DEBT." Yet, despite what appears to be a gradual but constant progression toward a plan for a highly-leveraged acquisition, Defendants never announced a change or expected change from the "upper-60 percent" leverage ratio guideline until the Snapple acquisition was publicly announced on November 2, 1994.

Similar behavior to that of Defendants has been considered worthy of jury consideration by the Seventh Circuit. *See, e.g., Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 650 n.7 (7th Cir. 1995). In *Caremark*, the plaintiffs alleged that the defendants falsely represented that its business strategy was to focus on its "core business" and to divest "non-strategic businesses," even though the defendant had been negotiating to acquire an allegedly "non-core" business. The Seventh Circuit, in reversing the district court's granting

of a motion to dismiss, noted that "assuming that a fact-finder determines that [the acquisition target] was a 'non-core' or 'non-strategic' business and that [defendant's] failure to disclose these negotiations was material, the fact-finder could then infer that [defendant's] failure to disclose its ongoing negotiations was done recklessly or with the intent to defraud." *Id.* Here, similarly, Defendants' alleged failure to update the public based upon the facts presented by Plaintiffs could allow a reasonable juror to find in favor of Plaintiffs on the element of scienter.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Doc. No. 94-1 is denied.

ENTER:

Dated: November 9, 2000

REBECCA R. PALLMEYER
United States District Judge

(weiner.sj)

32